UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Life Share Collateral Holdings, LLC

    Plaintiff,

v.

Ronald Albers; Raymond Byron Whitaker,
an individual, d/b/a Easy Financial Software
& Solutions, LLC; Reginald Barnes;
Sterling Harris; and Volios Group, LLC,

    Defendants.

Civil No. 11-3605 (JNE/JJK)
ORDER

---

Adam M. Simon, The Simon Law Firm, and Thomas H. Schaefer, Erstad & Riemer, appeared for Plaintiff Life Share Collateral Holdings, LLC.

Eric N. Linsk, Eric C. Tostrud, Lockridge Grindal Nauen PLLP, appeared for Defendant Ronald Albers.

---

    The predecessor to Plaintiff Life Share Collateral Holdings, LLC ("LSCH") entered into a loan agreement with a trust. Pursuant to the loan agreement, LSCH's predecessor loaned a substantial amount of money to that trust, for which Defendant Ronald Albers signed a personal guarantee, and those loan proceeds were used to purchase two large life-insurance policies on Albers's life. The loan was not repaid. In this lawsuit, LSCH seeks compensation for more than $600,000 it alleges is owed to it by Albers as guarantor.

    This case is before the Court on LSCH's motion for summary judgment, where LSCH asks this Court to enter judgment against Albers for the amount owed to it. Even though it is undisputed that Albers signed the personal guarantee and defaulted on the loan agreement, the Court denies LSCH's motion because the undisputed evidence shows that LSCH's predecessor and LSCH participated in insurance fraud known as stranger-oriented life insurance, or STOLI,

1

and the Court refuses to allow LSCH to recover sums from Albers when LSCH and LSCH's predecessor were part of the wrongdoing.

A STOLI scheme generally involves an elderly person with high net worth working with speculators to purchase life insurance. Commonly, the elderly person is promised cash upon the future sale of the policy or two years of free life insurance. The speculators provide financing to purchase the policy, and that financing is secured by the policy. At the end of the policy's two-year contestability period, when the insurer can challenge the policy, the financing becomes due. If the insured dies during the two-year contestability period, the financing is repaid from the proceeds of the policy. If the insured survives the period, then the insured may pay the financing and retain the policy or sell the policy on the secondary market and repay the financing from the proceeds of the sale. *Carton v. B&B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1239 (D. Nev. 2011). In this case, the insured was Albers, and LSCH's predecessor provided the financing to purchase the high-value insurance policies on Albers's life.

## I. BACKGROUND

The following facts are undisputed.

In 2008, Albers met with Defendant Sterling Harris to discuss Albers's interest in purchasing life insurance. Harris encouraged Albers to consider the life-settlement business, where Albers would purchase a substantial life-insurance policy, hold it for at least two years, and then sell it on the secondary market for a significant return. Harris told Albers he knew a lender who would finance the premiums on the insurance policy. Harris and his co-broker, Defendant Reginald Barnes, told Albers he would never have to pay back the loan financing the insurance premiums because the loan would be repaid either from the proceeds of the insurance

policy's sale or from the policy's death benefit if Albers died. Albers let Harris and Barnes go forward with the life-insurance application.

Life Share Financial ("Life Share"), the premium-finance lender, sent Albers the documents creating the Ronald Albers 2008 Family Irrevocable Trust ("Trust") with tabs indicating where Albers should sign. Albers discussed the creation of the Trust with David Simon, who represented that he was a lawyer for Life Share, and David Simon indicated that Life Share would only loan money to a trust and that the Trust would be created at Wells Fargo. The Trust was formed on November 7, 2008.

Harris, Barnes, and a general insurance agent decided Albers should apply for life insurance through Lincoln National Life Insurance Company ("Lincoln"), and an application signed on November 12, 2008 was submitted to Lincoln. The first part of the application reported Albers's annual income and net worth—both of which were grossly inflated—and Albers asserts he did not fill out or sign that portion of the application. Another portion of the application, the Insured & Owner Premium Financing Questionnaire, included an acknowledgment that Albers expected to keep the life insurance policy for at least five years and that Albers had not had any discussions about eventually selling the policy. That questionnaire also asked if the life insurance policy was the only collateral for the loan, and Albers acknowledged that a Personal Guaranty acted as additional collateral. Albers does not deny that he filled out and signed the questionnaire.

Around this time, Albers had several telephone conversations with David Simon and Lawrence McTernan, a managing partner at Life Share, about the premium-finance loan from Life Share; Albers was told that Life Share would pay the premiums on the life-insurance policies for two years and could pay for an additional two years almost automatically. On

November 17, 2008, McTernan signed Lincoln's Premium Financing Lender Certification. In that document, McTernan represented to Lincoln that Life Share understood that Lincoln "does not want to issue any life insurance policies where any of the parties are considering, or actually intend, the eventual transfer of the life insurance policy to a life settlement company or other investors." (Dkt. 72-7 at 3.)

On November 28, 2008, Lincoln issued two $10 million policies ("Policies") to the Trust insuring the life of Albers. The Policies contained incontestability provisions, where Lincoln agreed that it would not contest the Policies after they had been in force for two years.

In early December 2008, Adam Simon and David Simon received Albers's 2006 and 2007 tax returns and life-insurance applications. Albers's 2006 and 2007 tax returns show an income of approximately $143,000 and $63,000, respectively. In contrast, his annual earned income as reported on his life insurance application was $250,000.

On December 16, 2008, the Trust as the borrower, Life Share as the lender, and Albers as the insured entered into the Loan and Security Agreement ("Loan Agreement"). In the Loan Agreement, Albers represented that he had a net worth exceeding $5 million, that the applications for life insurance were correct, that he understood the Loan Agreement and the documents relating to the Policies, and that he had sought out his own legal advice with respect to the Loan Agreement. The Loan Agreement included a Personal Guaranty, where Albers agreed to be responsible for 25% of the sums that were due under the Loan Agreement.[1] Albers asserts that the Loan Agreement was presented to him on a take-it-or-leave-it basis.

Also on December 16, 2008, the Trust requested that Life Share disburse the loan proceeds. That same day, Life Share sold the Loan Agreement to Gesher, LLC—whose sole and

---

[1] The Personal Guaranty is to be interpreted in accordance with the laws of Minnesota.

managing member is David Simon. At some point, Gesher assigned all of its rights, title, and interest in the Loan Agreement to LSCH. The sole and managing member of LSCH is David Simon.

In late 2010 and early 2011, multiple emails between and among David and Adam Simon, Sterling Harris, Reginald Barnes, Lawrence McTernan, Ryan McTernan, and individuals employed by life-settlement companies evidence the efforts of David and Adam Simon, Harris, and Lawrence and Ryan McTernan to sell the Policies.[2] During that time, David and Adam Simon sent applications to Albers to sell the Policies; one of the applications was from Ashar Group, a life-settlement company. The Ashar application asked several questions about Albers's intent in obtaining the Policies; David Simon encouraged Albers to answer no to the question of whether Albers had arranged to sell or transfer the Policies to a third party when Albers procured the Policies. Albers avers he was nervous about this question because from the beginning the plan had been to sell the Policies after two years.

The Policies were never sold on the secondary market.[3] Eventually, Albers was informed that Life Share would not make any more premium payments on the Policies, and the Policies lapsed for lack of payment in April and July 2011.

In November 2011, David Simon, acting as an attorney for LSCH, sent Albers a letter stating, "Our client has instructed us to commence litigation with regard to the [Life Share]

---

[2]   In one email, David Simon informed Ryan McTernan, a person employed by a company named Madison One Associates, that Madison One should pay the premium on one of the Policies because "Gesher never wanted to place" that Policy. (Dkt. 72-2 at 29.) The record shows that Ryan McTernan and Lawrence McTernan worked at Madison One in 2010 and 2011. And an April 2011 email stated that "Lawrence McTernan/Madison One Associates will sign off as broker for the sale of the Albers policy." (Dkt 72-2 at 120.)

[3]   Albers's increased life expectancy was one reason the Policies were not sold.

premium finance loan. In order to help mitigate your liability, our client is willing to . . . accept an assignment of your claims against Reginald Barnes, Sterling Harris," and others. Albers signed the enclosed assignment of claims form and returned it. At some point, Albers had a telephone conversation with David Simon, where Simon told Albers that if Albers cooperated, LSCH would not accuse Albers of fraud. David and Adam Simon also visited Albers at his home in Texas, Albers told them that his signature had been forged on the Lincoln application, and they agreed that there was a discrepancy between the signature on the application and Albers's actual signature.

LSCH then commenced a lawsuit against Albers, Barnes, Harris, and others. LSCH moved for summary judgment on Count I of the Third Amended Complaint, which is only alleged against Albers and asserts default on the Loan Agreement and Personal Guaranty.

## II.   ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Albers argues that that summary judgment in favor of LSCH is not appropriate because the doctrine of *in pari delicto* bars LSCH's recovery against Albers. The doctrine of *in pari delicto* is a defense embodying the principle "that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir. 2005) (quotation omitted); *see In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1004 (8th Cir. 2007). "One purpose of the doctrine is to prevent the courts from

getting thrust into the position of finding facts where the parties have devised a scheme to deceive outsiders." *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 814 (Minn. App. 2007) (quotation omitted); *see Kansas City Operating Corp. v. Durwood*, 278 F.2d 354, 358 (8th Cir. 1960) ("Ordinarily one who participates in a conspiracy to defraud third persons is regarded as morally delinquent and not entitled to restitution from another participant." (quotation omitted)). The doctrine is applied to "parties to an illegal contract" because "[g]enerally anyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity." *State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972) (quotation omitted). "Minnesota courts will not apply the doctrine to defeat the performance of a contract which was in itself not illegal either on its face or in its enforcement." *Katun Corp. v. Clarke*, 484 F.3d 972, 978 (8th Cir. 2007) (quotation omitted). Consequently, if the contract was "not part of an illegal scheme," the doctrine of *in pari delicto* will not apply. *Id.* The doctrine can apply even though no injury to an outside party has been shown. *Long v. Smead Mfg. Co.*, 383 N.W.2d 452, 455 (Minn. App. 1986).

The Court concludes that the doctrine of *in pari delicto* bars LSCH's attempt to enforce the Personal Guaranty against Albers. Albers has presented undisputed facts that suggest that Albers and the predecessor to LSCH (Life Share) and its agents (Lawrence McTernan and David Simon) were involved in a scheme to defraud Lincoln. David Simon aided in the creation of the Trust to which Life Share loaned money, told Albers that Life Share would pay the premiums on the Policies for the first two years, assisted in the process of finding a purchaser for the Policies after the Policies' two-year contestability provisions expired, and encouraged Albers to falsely assert on an application for Ashar Group that Albers had not intended to sell the Policies to a third party when Albers purchased them. Lawrence McTernan signed Lincoln's Premium

Financing Lender Certification in November 2008, where he acknowledged that Lincoln did not want to issue life-insurance policies to parties who were considering the transfer of the policies to a life-settlement company. However, an April 2011 email sent to an individual at a life-settlement company states that Lawrence McTernan—now working for Madison One Associates—would sign off as a broker on the sale of the Policies. Life Share also had Albers's 2006 and 2007 tax returns and his Lincoln life-insurance application before the Loan Agreement was signed, and those documents show a vast discrepancy in Albers's annual income as reported to Lincoln and as reported on his tax returns. Albers himself did not deny filling out and signing the Lincoln Insured & Owner Premium Finance Questionnaire, where Albers asserted that he expected to keep the policy for at least five years and where he stated that he had not had any discussions about the eventual sale of the Policies. And crucial to the scheme to defraud Lincoln was the Loan Agreement, of which the Personal Guaranty is part, because the Loan Agreement made the purchase of the Policies possible. The Loan Agreement contained the false assertions that the life insurance applications were correct and all documents relating to the Policies were correct. By its predecessor's involvement—and the involvement of its current sole and managing member, David Simon—in a fraudulent scheme, LSCH has forfeited the right to enforce the Personal Guaranty against Albers.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. LSCH's Motion for Summary Judgment [Docket No. 66] is DENIED.

Dated: July 1, 2013

                                               s/Joan N. Ericksen
                                               JOAN N. ERICKSEN
                                               United States District Judge